1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10   ROBERT COHEN,                                CASE NO. 11-5491 RJB

11                    Plaintiff,                  ORDER ON MOTION FOR
                                                 PARTIAL SUMMARY JUDGMENT
12           v.

13   SEAN BOYLE, LINDA HAYES; DAVID
     MILLER; ANDRE QALOZH; THE
14   CLARK COUNRTY SHERIFFS
     OFFICE, CLARK COUNTY
15   WASHINGTON, AND CLARK
     REGIONAL EMERGENCY SERVICES
16   AGENCY,

17                    Defendants.

18

19           This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment.

20   Dkt. 38.  The Court has considered the pleadings filed in support of and in opposition to the

21   motion and the file herein.

22           In the pending motion, Plaintiff seeks partial summary judgment on his Fourth

23   Amendment claims against Clark County, Washington Sheriff's Deputies Sean Boyle and David

24   Miller, Sergeant Linda Hayes, and Clark Regional Emergency Services Agency's ("CRESA")

1    dispatcher, Andre Zalozh.  Dkt. 38.  Plaintiff moves the Court for a ruling that: 1) these

2    Defendants violated clearly established Fourth Amendment law by entering his home without a

3    warrant or legal cause; 2) Defendants Boyle and Miller violated clearly established Fourth

4    Amendment law by seizing him and forcibly removing him from his home; and 3) they are not

5    entitled to qualified immunity.  *Id.*  Plaintiff's motion should be denied because he has not shown

6    that there are no issues of fact and that he is entitled to a judgment on these two Fourth

7    Amendment claims, or that Defendants are not entitled to qualified immunity.  To the extent that

8    Defendants make motions for qualified immunity on these claims in their responses, the motions

9    should denied without prejudice for failure to follow Western District of Washington Rule of

10   Civil Procedure 7(d).

11                      **I.    FACTS AND PROCEDURAL HISTORY**

12   **A.  RELEVANT FACTS**

13       Around 9:00 in the evening of May 30, 2010, CRESA dispatcher Andre Zalozh, and

14   Defendant here, took a call on the 9-1-1 line.  Dkts. 43-1, at 2 and 43-2, at 2.  The caller was

15   Plaintiff's son, Jon Cohen-Doyle.  Dkt. 43-2, at 4.  In the recorded conversation, Mr. Cohen-

16   Doyle told dispatcher Zalozh that he called to talk with his father around five minutes ago, and

17   his father said that he was going to kill himself.  Dkt. 43-2, at 5.  Dispatcher Zalozh asked him if

18   Plaintiff had ever made threats in the past, and Mr. Cohen-Dolye responded, "[h]e's tried to do it

19   before, yeah."  Dkt. 43-2, at 5.  Mr. Cohen-Dolye told dispatcher Zalozh that he "took pills and

20   stuff" last time.  Dkt. 43-2, at 5.  Mr. Cohen-Dolye stated that he did not know if his dad had

21   taken any pills that night.  Dkt. 43-2, at 5.  When asked if Plaintiff had any weapons in the house,

22   Mr. Cohen-Dolye responded "no."  Dkt. 43-2, at 6.  Dispatcher Zalozh asked, "did he make a

23   specific threat tonight as to how he was going to do it?"  Dkt. 43-2, at 7.  Mr. Cohen-Dolye

24

1  answered "[h]e just told me that he was already - - he was already going to kill himself tonight."

2  Dkt. 43-2, at 7.

3      In response to the call, dispatcher Zalozh sent members of the Clark County Sheriff's Office

4  to Plaintiff's house. Dkt. 43-1, at 2. Defendant Deputies Sean Boyle and David Miller and

5  Sergeant Linda Hayes responded. *Id.*

6      As Deputy Boyle was headed to Mr. Cohen's home, his understanding of the situation was

7  that "the subject's son was calling and said he was going to kill himself." Dkt. 42-2, at 14. He also

8  knew that "medication" was involved–"either the son told dispatch he said he took a bunch of pills

9  or dispatch told us that [Plaintiff] said he had ingested some pills." Dkt. 42-2, at 118.

10     By the time he arrived, Deputy Miller was aware that there was "a third party complaint made

11 by his son that [Plaintiff] was . . . threatening suicide by overdose of medications; that he had

12 been drinking, that there were some dogs in the house; and that he perhaps might somehow turn

13 the dogs on us if we came into the house." Dkt. 42-3, at 18.

14     Sgt. Hayes, a supervisor at the Clark County Sherriff's office, felt that she should also

15 respond. Dkt. 42-1, at 10. When she got to the house, she was aware that Plaintiff's son called

16 for help regarding his father's potential suicide. Dkt. 42-1, at 10. She knew that Plaintiff had

17 attempted suicide in the past. Dkt. 24-1, at 27. Sgt. Hayes knew both Plaintiff and Plaintiff's son

18 due to her past work as a school resource officer. Dkt. 42-1, at 10, and 16-17. While she was a

19 school resource officer, Sgt. Hayes spent time "hunting [Plaintiff's son] down" after he had run

20 away from home, and getting him to court, or wherever else he needed to go. Dkt. 42-1, at 16-

21 17. She knew that Plaintiff's son was "troubled" and would steal items from his father. Dkt. 42-1,

22 at 16-17. Sgt. Hayes also felt that Plaintiff was "very sad" over his son's behavior. Dkt. 42-1, at

23 17. She also felt that Plaintiff's son was not dishonest with her. Dkt. 42-1, at 18. Sgt. Hayes

24

1    knew that Plaintiff had dogs, and that the officers needed to be careful because of the dogs.  Dkt.

2    42-1, at 24.

3         Once they arrive at the house, Sgt. Hayes stood by a tree in the front yard, Deputy Miller

4    went to the front door, and Deputy Boyle opened the gate and went into the backyard.  Dkts. 42-

5    1, at 34, and 42-2, at 21.  Plaintiff did not answer the officers' knocks at his door.  Dkt. 39-5, at 5.

6    Dispatcher Zalozh states that "[a]t the direction of the responding deputies," he called Plaintiff to

7    relay information to the officers.  Dkt. 43-1, at 2.  While on the phone with Plaintiff, dispatcher

8    Zalozh was also in radio contact with the responding deputies.  Dkt. 43-2, at 3.

9         In the recorded conversation, dispatcher Zalozh told Plaintiff that he was 9-1-1 dispatch, and

10   asked Plaintiff how he was doing.  Dkt. 43-2, at 11.  Plaintiff stated, "I'm doing miserably."  Dkt.

11   43-2, at 11.  The recorded conversation proceeded:

12        MR. COHEN:  I'm in my house, but don't send anybody.
         DISPATCH:  Okay.  And are you by yourself?
13        MR. COHEN:  I have my three dogs.
         DISPATCH:  Okay.  All right.  And why are you doing miserably, what's going
14        on?
         MR. COHEN:  Oh, my son's a thief, a liar, a cheat, a no-good person.  He's
15        mentally ill.  He needs lots of help.
         . . . .
16        DISPATCH:  Uh-huh.  Do you have any guns or knives with you right now?
         . . . .
17        Mr. COHEN:  No. I don't believe in guns or knives.
         DISPATCH:  Okay.  All right.  I do have a few deputies outside.  Can you come
18        out and talk to them real quick?
         MR. COHEN:  No, I don't want to.
19        DISPATCH:  Okay.  Why not?
         MR. COHEN:  Because I would like to die.
20        DISPATCH:  So how would you do that if you would do it?
         MR. COHEN: Oh, I have lots of drugs.
21        DISPATCH: Okay.  One moment.  Okay?  One moment.
         MR. COHEN: Tell 'em not to come in.  I've got three big dogs here.  Not
22        dangerous dogs, but three dogs who might get all excited if somebody came in.
         And I don't really care you know.  My son probably called you, but, you know,
23        he's the big problem.  He's nothing worth any more life than me.
         DISPATCH:  Okay.  Have you ever tried to commit suicide in the past?
24

MR. COHEN:  I've tried.
DISPATCH:  Okay.
MR. COHEN:  I'm just drunk right now.
DISPATCH:  How much have you had to drink?
MR. COHEN:  A bottle of wine.
DISPATCH:  Okay.
MR. COHEN:  Tell 'em to -- to -- to go away.
DISPATCH:  Okay.  One moment.
MR. COHEN:  You hear my dogs; they're not happy.
DISPATCH:  Would they attack officers or anything?
MR. COHEN:  No.
DISPATCH:  No?
MR. COHEN:  No.  They're nice dogs.  They'd jump up on 'em and they'd lick 'em.

Dkt. 43-2, at 11-13.  Dispatcher Zalozh states that when Plaintiff first told him he had "three big dogs here," he immediately relayed to the deputies that Mr. Cohen was "threatening you that he's going to release his dogs."  Dkt. 43-1, at 2.  He "interpreted Mr. Cohen's comments about his dogs as a threat to the deputies."  Dkt. 43-1, at 2.  Dispatcher Zalozh states that after Plaintiff told him the dogs would not attack the officers, he reported to the deputies that Mr. Cohen was now "saying the dogs are not harmful and they will jump and lick you."  Dkt. 43-1, at 2.  Dispatcher Zalozh told the deputies that he could hear the dogs growling and "that they sounded aggressive" to him.  Dkt. 43-1, at 2-3.  The conversation between the Plaintiff and dispatcher Zalozh continued:

MR. COHEN: But tell 'em I don't want to go.  I don't want to go to a psychiatric ward.  I don't want anything like that. . . . It won't do any good, so there is no point. . . . .
DISPATCH:  Okay.  Well, they just want to contact you and make sure that you are okay.  It's not going to do great harm, you know, if you just open the door and just talk to them real - - -
MR. COHEN:  No.  They could arrest me and throw me in the psychiatric ward.

Dkt. 43-2, at 14.  Sgt. Hayes states that at this point, she felt there was a mental health emergency.  Dkt. 42-1, at 28.  She knew Plaintiff was inebriated and felt "he could have ingested anything."  Dkt. 42-1, at 28.  Sgt. Hayes, in response to hearing that Plaintiff refused to come to the door, testified that she "used a ruse saying 'come to the door or we'll have to break down his

door." Dkt. 42-1, at 43.  Dispatcher Zalozh followed her directive and told Mr. Cohen the

deputies will "break down his front door" if they have to." Dkt. 43-1, at 3.  The transcript of the

recorded call states:

> VOICE: (Inaudible) we will break down his front door.
> MR. COHEN:  And I don't want 'em to do that because I am not crazy.
> DISPATCH:  Okay.  Robert, they will contact you whether you like it or not, so
> we can do it, like, peacefully where you come out and talk to them or they will
> just break your door and they will talk to you.  But either way, they have to talk to
> you in person.  So it's going to be a lot more expensive for you if they would have
> to break down your door.
> MR. COHEN:  All right. I'll go talk to them.
> DISPATCH:  You'll go talk to them?
> MR. COHEN:  Yes. . . I can barely walk.

Dkt. 43-2, at 13-15.  Dispatcher Zalozh states that at that point, it sounded like Mr. Cohen was

talking with deputies at his doorway, and so disconnected from the call.  Dkt. 43-1, at 3.

        According to Sgt. Hayes, once Plaintiff came to the door, they asked him to step outside.

Dkt. 42-1, at 65.  (Plaintiff's version of events sharply diverges from Defendants' here, but for the

purposes of this motion will not be discussed).  Plaintiff was dressed in a t-shirt and shorts, and it

was cold.  Dkts. 42-2, at 94; 39-1, at 6-7.  Plaintiff's dogs were barking loudly and jumping on the

officers.  Dkts. 42-1, at 65 and Dkt. 42-3, at 23.  Deputy Miller testified that it was very difficult

to communicate with Plaintiff because the dogs were so loud, so he asked Plaintiff to step

outside and close the door.  Dkt. 42-3, at 23.  Plaintiff declined.  Dkt. 42-3, at 24.

        In his interview with the Clark County Sheriff's Office of Internal Affairs, Plaintiff states

that, at that point, he "asked them if they wanted to come in." Dkt. 39-1, at 8.  According to

Deputy Miller, Plaintiff then turned around and sat back down in the living room.  Dkt. 42-3, at

24.  Sgt. Hayes and Deputy Miller followed Plaintiff into the house.  Dkt. 42-3, at 26.  Sgt.

Hayes felt Plaintiff was intoxicated, observing that Plaintiff was slurring, and noticed that the

dogs were "agitated" and "unsettled." Dkt. 42-1, at 70.  Deputy Boyle, who was still in the backyard,

1   was told to come in front.  Dkt. 42-2, at 26.  He states that he walked around front, saw that the

2   front door was open and the other officers were inside talking with Plaintiff/  Dkt. 42-2, at 26.

3   He entered through the open front door.  Dkt. 42-2, at 26.  Sgt. Hayes left the residence when

4   Deputy Miller started to talk with Plaintiff inside.  Dkt. 42-1, at 78.

5           Deputy Miller stood in front of the couch where Plaintiff was sitting.  Dkt. 42-3, at 27.

6   Plaintiff appeared "agitated," Dkt. 42-3, at 28, but did not seem "overly intoxicated" to Deputy Miller

7   –he did not notice Plaintiff's "staggering and slurring." Dkt. 39-5, at 11.  All three large dogs

8   continued to bark and "were rushing around," hitting Deputy Miller in the legs, "knocking [him] off

9   balance."  Dkts. 42-3, at 37 and 39-5, at 6.  Deputy Miller asked Plaintiff a few questions:  if he

10  knew why they were there, if he had been drinking, and whether he had taken any medication.

11  Dkt. 42-3, at 33.  Plaintiff allegedly answered "yes" to the first two questions, and "no" to the last.

12  Dkt. 42-3, at 33.  Deputy Boyle also remembers that Deputy Miller asked Plaintiff if he would

13  see the paramedics, who were outside, and Plaintiff said "no." Dkt. 42-2, at 118.  Deputy Miller

14  states that even though Plaintiff told him that he had not had any medication, based on his

15  experience, it was not "uncommon for people not to be entirely honest with us in these types of

16  situations." Dkt. 42-3, at 40.  Deputy Miller felt that he should have the paramedics make the

17  determination of whether Plaintiff had taken medication in an effort to end his life.  Dkt. 42-3, at

18  40.  Deputy Miller felt "an obligation to ensure that [Plaintiff] was not a danger to himself or

19  others." Dkt. 42-3, at 44.

20          Deputy Boyle was in the kitchen, which was behind the couch.  Dkt. 42-3, at 29.  Deputy

21  Boyle felt Plaintiff was intoxicated because he had "heavily slurred speech." Dkt. 42-2, at 31.

22  Deputy Boyle also noted Plaintiff appeared to be having "mood swings." Dkt. 42-2, at 32.  Deputy

23

24

1   Boyle perceived the dogs as "[o]verly excited to the point of aggression, barking wildly and

2   [making] an occasional growl." Dkt. 42-2, at 35.

3           One of the dogs jumped on Deputy Boyle, and Deputy Boyle "kneed" the dog down.  Dkt.

4   42-2, at 36.  According to Deputy Boyle, Plaintiff then informed him that he should just pat the

5   dogs "on the head gently and say no." Dkt. 42-2, at 36.  Deputy Boyle responded that he knew

6   "how to handle a dog." Dkt. 42-2, at 36.  According to the deputies, Plaintiff got off the couch and

7   aggressively headed toward Deputy Boyle, who was in the kitchen.  Dkt. 42-2, at 37.  Deputy

8   Miller told Plaintiff to sit back down.  Dkt. 42-2, at 37.  When Plaintiff got within "striking

9   distance," Deputy Boyle held his right hand out toward Plaintiff's chest.  Dkt. 42-2, at 37.  Deputy

10  Boyle told Plaintiff to sit back down.  Dkt. 42-2, at 39.  Plaintiff yelled and pushed his chest into

11  Deputy Boyle's hand.  Dkt. 42-2, at 39.  Both deputies felt that Plaintiff was being overly

12  aggressive at that point.  Dkt. 42-2, at 119; 42-3, at 36.  Concerned about the dogs, who were

13  getting more agitated, were all three barking at their feet, and kept bumping into them, Deputy

14  Miller stated that they needed to go outside to get away from the dogs.  Dkts. 42-2, at 39; 42-3, at

15  36.  Plaintiff repeatedly yelled "no." Dkt. 42-3, at 38 and 47.

16          At that point, Deputy Boyle grabbed Plaintiff's left hand and Deputy Miller grabbed his

17  right arm.  Dkt. 42-2, at 42.  Deputy Miller repeatedly told Plaintiff to step outside and stop

18  resisting.  Dkt. 42-3, at 54.  According to Deputy Boyle, Plaintiff's fist became rigid and Deputy

19  Boyle bent his left arm and put it in a gooseneck hold.  Dkt. 42-2, at 48.  They began taking

20  Plaintiff down the hallway and he was trying to pull away.  Dkt. 42-2, at 51.  Deputy Boyle was

21  losing his grip on the gooseneck hold, so he held Plaintiff up against the bathroom doorjamb.

22  Dkt. 42-2, at 52.  Deputy Boyle states that he then transitioned from the gooseneck to trying to

23  put Plaintiff's arm behind his back so he could put handcuffs on him.  Dkt. 42-2, at 53. Plaintiff

24

'flexed his bicep so [they] we pretty much locked up." Dkt. 42-2, at 54.  They decided to use a

taser. Dkt. 42-2, at 54.  Deputy Boyle's right arm was pushing against Plaintiff.  Dkt. 42-2, at 55.

Deputy Boyle, who is left-handed, reached across his body, and pulled out his taser.  Dkt. 42-2,

at 55.  He tased Plaintiff in the left upper trapezius muscle, about four inches from his neck.  Dkt.

42-2, at 59.  According to Deputy Boyle, Plaintiff then spun to the left and grabbed the taser.

Dkt. 42-2, at 60.  Deputy Boyle says that he grabbed the taser back.  Dkt. 42-2, at 60.  Deputy

Miller states, "[w]hen the first taser was deployed, [he] had a pretty sharp shock through [his] . . .

arm." Dkt. 42-3, at 62.  Deputy Boyle tased him again in the lower left of Plaintiff's back, just

above his waist.  Dkt. 42-2, at 61.

       After being tased the second time, Plaintiff appeared a little "dazed." Dkt. 42-2, at 61.  Deputy

Boyle forced Plaintiff to his knees on the floor, and went down with him.  Dkt. 42-2, at 63.

Deputy Miller let go of Plaintiff's arm in order to pull his legs out of a kneeling position and into

a fully prone position. Dkt. 42-3, at 56.  During this struggle, Deputy Boyle repeatedly told

Plaintiff to stop resisting, and Plaintiff purportedly was yelling "no." Dkt. 42-2, at 64.  The dogs

continued to bark.  Id.  As Deputy Boyle was trying to get Plaintiff's hands behind his back, one

of Plaintiff's large dogs bit Deputy Boyle.  Dkt. 42-2, at 65.  The dog then grabbed  Deputy

Boyle's coat and tried to drag him back down the hall.  Dkt. 42-2, at 78.  Deputy Boyle pulled out

his gun.  Dkt. 42-2, at 78.  According to Deputy Boyle, Plaintiff grabbed his gun barrel, so

Deputy Boyle punched him in the face.  Dkt. 42-2, at 82.  Plaintiff let go of the gun, Deputy

Boyle shot the dog twice, and it ran out of Deputy Boyle's sight.  Dkt. 42-2, at 78.  After

struggling to get Plaintiff's legs straight, Deputy Miller went back to trying to get hold of

Plaintiff's arm, and that is when he heard the gun shots.  Dkt. 42-3, at 57.  According to Deputy

Boyle, Plaintiff then said, "you killed my dog and I am going to kill you." Dkt. 42-2, at 83.

1   Deputy Boyle then struck Plaintiff in the face and rib cage several times and kneed him, as

2   Plaintiff attempted to get up.  Dkt. 42-2, at 83.  The deputies were then able to get handcuffs on

3   Plaintiff.  Dkt. 42-2, at 85.  Plaintiff was taken to the Southwest Washington Medical Center,

4   given a mental health evaluation, and treated for abrasions and taser wounds.  Dkt. 39-9.  He was

5   released later that night.  *Id.*

6      **B.  PROCEDURAL HISTORY**

7      On June 28, 2011, Plaintiff filed this case.  Dkt. 1.  In his Amended Complaint, he makes

8   claims against the individual Defendants pursuant to 42 U.S.C. § 1983 for violation of his rights

9   under the Fourth and Fourteenth Amendments to the U.S. Constitution, including for "the

10  warrantless entry into his home, the unreasonable seizure of his person and effects (companion

11  dog), use of excessive force, and his arrest and detention without probable cause." Dkt. 28, at 13.

12  He makes claims against the Clark County Sherriff's Office for violation of his rights against

13  unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the U.S.

14  Constitution.  *Id.*  Plaintiff additionally makes claims for outrage, violations of Washington's

15  Public Records Act, RCW 42.46 *et. seq.*, and for "destruction of evidence." Dkt. 28, at 13-14.

16  Plaintiff seeks damages, injunctive relief, attorneys' fees, and costs.  Dkt. 28, at 14-15.

17     Discovery is being conducted.  Trial is set to begin on August 20, 2012.  Dkt. 21.

18  Defendants indicate motions for qualified immunity are imminent.  Dkts. 43 and 41.

19     **C.  PENDING MOTION**

20     In the pending motion, Plaintiff moves for summary judgment on his Fourth Amendment

21  claims against Defendants Deputy Boyle, Deputy Miller, Sgt. Hayes, and dispatcher Zalozh.

22  Dkts. 38 and 41.  He seeks a ruling that: 1) each of these Defendants violated clearly established

23  Fourth Amendment law by entering his home without a warrant or legal cause; 2) Defendants

24

1   Boyle and Miller violated clearly established Fourth Amendment law by seizing him and

2   forcibly removing him from his home; and 3) they are not entitled to qualified immunity. *Id.*

3   Plaintiff argues that the entry into his home that night was unconstitutional because his invitation

4   to enter was prompted by coercion and deception. *Id.* Plaintiff argues that there was no risk of

5   imminent risk to justify a warrantless entry. *Id.* Plaintiff argues that Deputies Boyle and Miller

6   lacked reasonable cause to seize him and forcibly remove him from his home and so violated his

7   constitutional rights. *Id.* Plaintiff argues that none of these Defendants are entitled to qualified

8   immunity. *Id.*

9       The Defendant officers oppose the motion, arguing that there are issues of fact as to whether

10  they violated his Fourth Amendment rights when they entered his home because he invited them

11  in and they had a reasonable belief that the situation was an emergency. Dkt. 41. They argue

12  that there are issues of fact as to whether Deputies Boyle and Miller violated his Fourth

13  Amendment rights when they detained him for a mental health evaluation. *Id.* They refer to

14  qualified immunity, but to the extent that any such motion is made, they did not note it in accord

15  with Local Rule 7(d). *Id.*

16      Defendant dispatcher Zalozh opposes the motion as well, arguing that there are issues of fact

17  as to whether he, who was not physically present, violated Plaintiff's Fourth Amendment rights

18  when the officers entered his home. Dkt. 43. Dispatcher Zalozh also references qualified

19  immunity, but does not properly note his motion, if any, either. *Id.*

20                    II.    **DISCUSSION**

21  **A. SUMMARY JUDGMENT STANDARD**

22      Summary judgment is proper only if the pleadings, the discovery and disclosure materials

23  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

24

movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt.").  *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question.  The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial– e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).  Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### B. PLAINTIFF'S MOTION ON HIS FOURTH AMENDMENT CLAIMS ASSERTED UNDER § 1983 AND QUALIFIED IMMUNITY

1    In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the

2    conduct complained of was committed by a person acting under color of state law, and that (2)

3    the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or

4    laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other*

5    *grounds, Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to

6    remedy an alleged wrong only if both of these elements are present. *Haygood v. Younger*, 769

7    F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

8        Defendants in a Section 1983 action are entitled to qualified immunity from damages for

9    civil liability if their conduct does not violate clearly established statutory or constitutional rights

10   of which a reasonable person would have known. *Pearson v. Callahan*, 129 S.Ct. 808, 815

11   (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity balances

12   two important interests: the need to hold public officials accountable when they exercise power

13   irresponsibly and the need to shield officials from harassment, distraction, and liability when

14   they perform their duties reasonably. *Harlow v. Fitzgerald*, 457 U.S. at 815. The existence of

15   qualified immunity generally turns on the objective reasonableness of the actions, without regard

16   to the knowledge or subjective intent of the particular official. *Id*. at 819. Whether a reasonable

17   officer could have believed his or her conduct was proper is a question of law for the court and

18   should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*,

19   988 F.2d 868, 872-73 (9th Cir. 1993).

20       In analyzing a qualified immunity defense, the Court must determine: (1) whether a

21   constitutional right would have been violated on the facts alleged, taken in the light most

22   favorable to the party asserting the injury; and (2) whether the right was clearly established when

23   viewed in the specific context of the case. *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001). "The

24

1   relevant dispositive inquiry in determining whether a right is clearly established is whether it

2   would be clear to a reasonable officer that his conduct was unlawful in the situation he

3   confronted." *Id.*  While the sequence set forth in *Saucier* is often appropriate, it should no longer

4   be regarded as mandatory.  *Pearson v. Callahan*, at 129 S.Ct at 811.  "The judges ... should be

5   permitted to exercise their sound discretion in deciding which of the two prongs of the qualified

6   immunity analysis should be addressed first in light of the circumstances in the particular case at

7   hand."  *Id.*  The two prong *Saucier* analysis is useful in examining Plaintiffs claim that the

8   individual Defendants violated his Fourth Amendment right to be free from unreasonable

9   searches.  No further analysis under *Saucier* is required for purposes of this motion because he

10  has failed to show that there are no issues of fact as to whether Defendants' violated his Fourth

11  Amendment rights when the officers entered his home and when Deputies Boyle and Miller

12  detained him for a mental health evaluation.

13              *1.      Entry into the Home – Violation of Fourth Amendment?*

14          The Fourth Amendment to the U.S. Constitution guarantees, "[t]he right of the people to

15  be secure in their persons, houses, papers, and effects, against unreasonable searches and

16  seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." "A

17  warrantless entry into a home violates the Fourth Amendment unless an exception to the Fourth

18  Amendment warrant requirement applies, such as emergency, exigency, or consent." *Espinosa v.*

19  *City and County of San Francisco*, 598 F.3d 528, 533 (9th Cir. 2010).

20          It is undisputed that the officers did not have a warrant to enter Plaintiff's home that night.

21  The individual Defendants offer two exceptions to the Fourth Amendment's proscription on

22  warrantless searches:  that Plaintiff invited them into the house, and that there were

23  emergent/exigent circumstances.

24

a.   <u>Voluntary Consent</u>

A home owner's voluntary consent to a search of their home is an exception to the Fourth Amendment's warrant requirement.  *Delia v. City of Rialto*, 621 F.3d 1069, 1077 (9th Cir. 2010).  "In some circumstances, officers can obtain an invitation to enter a private place through a ruse in order to investigate criminal activity."  *U.S. v. Garcia*, 997 F.2d 1273, 1280 (9th Cir. 1993)(*citing Lewis v. United States*, 385 U.S. 206, 211(1966)).  For example, "[a]n officer may, consistent with the fourth amendment, conceal his or her identity to obtain an invitation to enter a suspect's home."  *U.S. v. Bosse,* 898 F.2d 113, 115 (9th Cir. 1990); *but see United States v. Johnson*, 626 F.2d 753 (9th Cir.1980).  The officer may not, however, acquire entry by "misrepresenting the scope, nature or purpose of a government investigation." *Bosse*, at 115.

In *Garcia*, the Ninth Circuit held that officers who engaged in a ruse to trick the defendant into opening the front door did not violate the Fourth Amendment.  *U.S. v. Garcia*, 997 F.2d 1273, 1280 (9th Cir. 1993).  There officers, who were posing as potential renters, talked with Garcia through a closed screen door.  *Id.*

> Deputy Letizio had an empty soda pop bottle in his hand. He asked Garcia to throw it away for him. When Garcia opened the screen door to take the empty bottle, the officers grabbed the door to keep it from closing.  Beers then flashed his badge and said, in a normal tone of voice, "we're police officers, we'd like to talk to you." Garcia said "okay," nodded his head, and stepped back into the house and out of the doorway.

*Id.,* at 1277.  The *Garcia* Court found that Garcia had voluntarily consented to the officers' entry.  *Id.,* at 1280.  However, "[i]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary." *Pavao v. Pagay,* 307 F.3d 915, 919 (9th Cir. 2002).

1    Complicating this case is that much of the relevant Fourth Amendment case law arises in the

2    criminal context.  In a Section 1983 civil case, "the plaintiff carries the ultimate burden of

3    establishing each element of his or her claim, including lack of consent." *Pavao,* at 919.

4    Considering all the circumstances here, Plaintiff's motion for summary judgment on his Fourth

5    Amendment claim should be denied.  If Defendants' version of event are believed, Plaintiff

6    invited the officers into his home.  In his interview with the Clark County Sheriff's Office of

7    Internal Affairs, Plaintiff states that he after he opened the door, he "asked them if they wanted to

8    come in." Dkt. 39-1, at 8. According to Deputy Miller, at that point, Plaintiff turned around and

9    sat back down in the living room.  Dkt. 42-3, at 24.  Plaintiff acknowledged that he knew who

10   they were and why they were there.  Dkt. , at .  Accordingly, there is no evidence that they

11   gained entry by "misrepresenting the scope, nature or purpose of a government investigation."

12   *Bosse*, at 115.

13   Plaintiff argues that even if Defendants' version of events are believed, he is still entitled to

14   summary judgment.  Dkts. 38 and 44.  He argues that his invitation to the officers was not really

15   voluntary consent because it was obtained by use of a ruse.  *Id.* (*citing U.S. v. Vaneaton*, 49 F.3d

16   1423, 1427 (9th Cir 1995)(holding that defendant voluntarily exposed himself to a warrantless

17   arrest when opened the door to uniformed police who did not use force, threats, a ruse, or

18   weapons)).  That is, that Sgt. Hayes acknowledged that they would not really break down his

19   door if he did not open it.  *Id.*  Plaintiff further argues that they could not have broken his door

20   down because there was no emergency situation.  *Id.*

21   Plaintiff has failed to carry his burden to show that there are no issues of fact as to whether his

22   consent was voluntary or not.  *Pavao,* at 919.  First, as below, there are facts supporting the

23   notion that this was, in fact, an emergency situation.  Further, even if Plaintiff felt he needed to

24

ORDER ON MOTION FOR PARTIAL SUMMARY
JUDGMENT- 16

1   answer the door to keep them from breaking it down, he did not show that he had to invite them

2   into the house. "[T]he Fourth Amendment has drawn a firm line at the entrance to the house."

3   *Payton v. New York*, 445 U.S. 573, 590 (1980).  If the evidence is viewed from the Defendant's

4   perspective, the officers here were not so much interested in entering the house, as they were in

5   just talking to Plaintiff face to face to see if he was alright.  Unlike the cases where the officers

6   were searching a house for contraband or attempting an arrest without a warrant, the officers

7   tried to accomplish their objective by having Plaintiff come outside and talk with him.  They

8   expressed no interest in coming into the house.  He did not want to go out because he was under

9   dressed for the weather.  Plaintiff has failed to show that there are no issues of fact as to whether

10   his invitation constituted voluntary consent.

11                          b.  Emergent or Exigent Circumstances

12          'Under the emergency exception, an officer may enter a home without a warrant to

13   investigate an emergency that threatens life or limb if the officer has objectively reasonable

14   grounds to believe that an emergency exists and that his immediate response is needed."

15   *Espinosa,* at 534 (*internal citations omitted*).  Derived from police officers' community

16   caretaking function, this exception allows the police to enter a home when an emergency which

17   threatens physical harm is presented.  *Id.*  The officer must have an objectively reasonable belief

18   that the circumstances justify entry.  *Id.*

19          Additionally, under Washington law, a police officer has, "the authority to take a person to

20   a hospital for mental evaluation upon 'reasonable cause to believe that such person is suffering

21   from a mental disorder and presents an imminent likelihood of serious harm or is in imminent

22   danger because of being gravely disabled.' *Luchtel v. Hagemann,* 623 F.3d 975, 979 (9th Cir.

23   2010)(*quoting* RCW 71.05.150(4)).

24

ORDER ON MOTION FOR PARTIAL SUMMARY
JUDGMENT- 17

1    In *Luchtel,* the Ninth Circuit found that police officers had reasonable cause to take a

2   woman to the hospital for a mental health evaluation, and affirmed the district court's dismissal of

3   her Fourth Amendment claim.  *Id.*  In that case, calls to 9-1-1 reported that she was hiding under

4   a car with her son, outside screaming that someone was going to kill her, and that she was going

5   to kill herself.  *Id.* When the officers arrived, they learned that she was on drugs and was hiding

6   at a neighbor's house.  *Id.*  Once they made contact with her, she made paranoid comments and

7   attempted to use the neighbor as a human shield.  *Id.*

8    Plaintiff's motion for partial summary judgment on his Fourth Amendment claim should be

9   denied.  He has failed to show that there are no issues of fact as to whether there was an

10   emergency situation.  While not as extreme as the woman in *Luchtel*, when viewed in a light

11   most favorable to Defendants, Plaintiff has not shown that there are insufficient facts to support

12   the notion that the officers had "reasonable cause to believe" that Plaintiff was suffering from a

13   "mental disorder" and presented "an imminent likelihood of serious harm" or was in "imminent

14   danger because of being gravely disabled." *Luchtel,* at 979.  When they arrived, they were aware

15   that Plaintiff had been drinking, that his son reported that he was ready to commit suicide that

16   night, and had tried to commit suicide in the past by taking pills.  Deputy Boyle stated that he

17   understood that "the subject's son was calling and said he was going to kill himself." Dkt. 42-2, at

18   14.  He also knew that "medication" was involved—"either the son told dispatch he said he took a

19   bunch of pills or dispatch told us that [Plaintiff] said he had ingested some pills." Dkt. 42-2, at

20   118.  Deputy Miller was aware that there was "a third party complaint made by his son that

21   [Plaintiff] was . . . threatening suicide by overdose of medications; that he had been drinking,

22   that there were some dogs in the house; and that he perhaps might somehow turn the dogs on us

23   if we came into the house." Dkt. 42-3, at 18.  Sgt. Hayes testified that she knew they were heading

24

1    out to the home of a man she knew from prior experience was "very sad," that he had attempted

2    suicide with pills in the past, and was threatening to do it tonight.  Dkt. 42-1, at 10, 16-17, 24 and

3    27.  Once they reached the house, the situation did not improve.  Plaintiff refused to answer the

4    door.  Plaintiff then reported to dispatcher Zalozh that he would "like to die." Dkt. 43-2, at 11-13.

5    When asked how he would do it, he replied "Oh, I have lots of drugs." Dkt. 43-2, at 11-13.  The

6    officers knew that this was his method of choice.  Although Plaintiff denied having ingested any

7    pills, Plaintiff has not shown that it was unreasonable for the officers to doubt him in this

8    circumstance.  They knew that he was intoxicated, but had no way to know if had taken anything

9    pills, or if he had, how long it would take for them to take effect.  Dkt. 42-1, at 28.  Increasingly

10    concerned, Sgt. Hayes states that at this point, she felt there was a mental health emergency, and

11    instructed dispatcher Zalozh to tell Plaintiff they would break down his door if he did not open it.

12    Dkt. 42-1, at 28.

13        Plaintiff has not shown that there are no issues of fact and that he is entitled to a

14    judgment as a matter of law that Defendants violated the Fourth Amendment when the officers

15    entered his home that night.  His motion should be denied.

16            2.     *Seizure of Plaintiff – Violation of Fourth Amendment*?

17        As stated above, Plaintiff has not shown that there are insufficient facts to support the

18    notion that the officers had "reasonable cause to believe" that Plaintiff was suffering from a "mental

19    disorder" and presented "an imminent likelihood of serious harm" or was in "imminent danger

20    because of being gravely disabled." *Luchtel,* at 979.  The above analysis regarding whether the

21    situation was an emergency applies.  Further, if the deputies' version of events are believed, once

22    in the house, Plaintiff's behavior continued to be of concern to the deputies, in particular his

23    reaction regarding Deputy Boyle's kneeing his dog.  *State v. Mason*, 56 Wash. App. 93

24

1    (1989)(individual's behavior, reported threats of suicide, and known prior attempts justified

2    officer's determination that detention for mental health evaluation was warranted).   Considering

3    all the circumstances, Plaintiff has not shown that there are no issues of fact regarding whether

4    Deputies Boyle and Miller violated his Fourth Amendment rights when they seized him for a

5    mental health evaluation or that he is entitled to a judgment as a matter of law.

6             3.       *Conclusion*

7             Plaintiff has failed to show that he is entitled to a judgment as a matter of law that the

8    individual Defendants violated his Fourth Amendment rights when they entered his home that

9    night or that Deputies Boyle and Miller violated his Fourth Amendment rights when they

10   detained him for a mental health evaluation.  Plaintiff's motion to have qualified immunity denied

11   for Defendants should be denied.

12   **C. DEFENDANTS' MOTIONS FOR QUALIFIED IMMUNITY**

13            To the extent that Defendants have moved for qualified immunity, their motions should

14   be denied without prejudice.  They have failed to properly note the motions in accord with the

15   Western District of Washington Rule of Civil Procedure 7(d) which is necessary in order to fully

16   and fairly hear from all sides on these issues.

17                              **III.    <u>ORDER</u>**

18            Therefore, it is hereby **ORDERED** that:

19            • Plaintiff's Motion for Summary Judgment (Dkt. 38) is **DENIED**;

20            • To the extent Defendants made motions for qualified immunity within their

21               responses, their motions **ARE DENIED WITHOUT PREJUDICE** for failure to

22               follow Western District of Washington Rule 7(d).

23

24

ORDER ON MOTION FOR PARTIAL SUMMARY
JUDGMENT- 20

1    The Clerk is directed to send uncertified copies of this Order to all counsel of record and

2    to any party appearing *pro se* at said party's last known address.

3    Dated this 16th day of April, 2012.

4
5
                          ROBERT J. BRYAN
6                            United States District Judge