|   |   |
|---|---|
| ROBERT COHEN, | CASE NO. 11-5491 RJB |
| Plaintiff, | ORDER ON DEFENDANTS ANDRE ZALOZH AND CRESA'S MOTION FOR SUMMARY JUDGMENT |
| v. | |
| SEAN BOYLE, LINDA HAYES; DAVID MILLER; ANDRE ZALOZH; THE CLARK COUNTY SHERIFF'S OFFICE, CLARK COUNTY WASHINGTON, AND CLARK REGIONAL EMERGENCY SERVICES AGENCY, | |
| Defendants. | |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

This matter comes before the Court on Defendants Andrey Zalozh and Clark Regional Emergency Services Agency's ("CRESA") Motion for Summary Judgment. Dkt. 48. The Court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

This civil rights case arises from a 9-1-1 call that Plaintiff was suicidal and the Defendants' subsequent visit to his home. Dkt. 1. Plaintiff alleges that Defendants violated his

ORDER ON DEFENDANTS ANDRE ZALOZH
AND CRESA'S MOTION FOR SUMMARY
JUDGMENT- 1

Fourth and Fourteenth Amendment rights and also makes claims under state law. Dkt. 1.

In the pending motion, Defendants Zalozh, a 9-1-1 dispatcher, and his employer CRESA, a municipal agency that provides dispatching services for Clark County, Washington, seek summary dismissal of Plaintiff's claims against them. Dkt. 48. For the reasons below, their motion should be granted.

## I. FACTS AND PROCEDURAL HISTORY

### A. RELEVANT FACTS

The facts and procedural history are contained in the April 16, 2012, Order on Plaintiff's Motion for Partial Summary Judgment (Dkt. 52, at 1-11) and are adopted here. For ease of reference, some of them will be repeated here.

Around 9:00 in the evening of May 30, 2010, CRESA dispatcher Andre Zalozh, and Defendant here, took a call on the 9-1-1 line. Dkts. 43-1, at 2 and 43-2, at 2. The caller was Plaintiff's son, Jon Cohen-Doyle. Dkt. 43-2, at 4. In the recorded conversation, Mr. Cohen-Doyle told dispatcher Zalozh that he called to talk with his father around five minutes ago, and his father said that he was going to kill himself. Dkt. 43-2, at 5. Dispatcher Zalozh asked him if Plaintiff had ever made threats in the past, and Mr. Cohen-Dolye responded, "[h]e's tried to do it before, yeah." Dkt. 43-2, at 5. Mr. Cohen-Dolye told dispatcher Zalozh that he "took pills and stuff" last time. Dkt. 43-2, at 5. Mr. Cohen-Dolye stated that he did not know if his dad had taken any pills that night. Dkt. 43-2, at 5. When asked if Plaintiff had any weapons in the house, Mr. Cohen-Dolye responded, "no." Dkt. 43-2, at 6. Dispatcher Zalozh asked, "did he make a specific threat tonight as to how he was going to do it?" Dkt. 43-2, at 7. Mr. Cohen-Dolye answered, "[h]e just told me that he was already - - he was already going to kill himself tonight." Dkt. 43-2, at 7.

In response to the call, dispatcher Zalozh sent members of the Clark County Sheriff's Office to Plaintiff's house. Dkt. 43-1, at 2. Defendant Deputies Sean Boyle and David Miller and Sergeant Linda Hayes responded. *Id*.

As Deputy Boyle was headed to Mr. Cohen's home, his understanding of the situation was that "the subject's son was calling and said he was going to kill himself." Dkt. 42-2, at 14. He also knew that "medication" was involved – "either the son told dispatch he said he took a bunch of pills or dispatch told us that [Plaintiff] said he had ingested some pills." Dkt. 42-2, at 118.

By the time he arrived, Deputy Miller was aware that there was "a third party complaint made by his son that [Plaintiff] was . . . threatening suicide by overdose of medications; that he had been drinking, that there were some dogs in the house;

and that he perhaps might somehow turn the dogs on us if we came into the house." Dkt. 42-3, at 18.

Sgt. Hayes, a supervisor at the Clark County Sherriff's office, felt that she should also respond. Dkt. 42-1, at 10. When she got to the house, she was aware that Plaintiff's son called for help regarding his father's potential suicide. Dkt. 42-1, at 10. She knew that Plaintiff had attempted suicide in the past. Dkt. 24-1, at 27. Sgt. Hayes knew both Plaintiff and Plaintiff's son due to her past work as a school resource officer. Dkt. 42-1, at 10, and 16-17. While she was a school resource officer, Sgt. Hayes spent time "hunting [Plaintiff's son] down" after he had run away from home, and getting him to court, or wherever else he needed to go. Dkt. 42-1, at 16-17. She knew that Plaintiff's son was "troubled" and would steal items from his father. Dkt. 42-1, at 16-17. Sgt. Hayes also felt that Plaintiff was "very sad" over his son's behavior. Dkt. 42-1, at 17. She also felt that Plaintiff's son was not dishonest with her. Dkt. 42-1, at 18. Sgt. Hayes knew that Plaintiff had dogs, and that the officers needed to be careful because of the dogs. Dkt. 42-1, at 24.

Once they arrived at the house, Sgt. Hayes stood by a tree in the front yard, Deputy Miller went to the front door, and Deputy Boyle opened the gate and went into the backyard. Dkts. 42-1, at 34, and 42-2, at 21. Plaintiff did not answer the officers' knocks at his door. Dkt. 39-5, at 5. Dispatcher Zalozh states that "[a]t the direction of the responding deputies," he called Plaintiff to relay information to the officers. Dkt. 43-1, at 2. While on the phone with Plaintiff, dispatcher Zalozh was also in radio contact with the responding deputies. Dkt. 43-2, at 3.

In the recorded conversation, dispatcher Zalozh told Plaintiff that he was 9-1-1 dispatch, and asked Plaintiff how he was doing. Dkt. 43-2, at 11. Plaintiff stated, "I'm doing miserably." Dkt. 43-2, at 11. The recorded conversation proceeded:

MR. COHEN: I'm in my house, but don't send anybody.
DISPATCH: Okay. And are you by yourself?
MR. COHEN: I have my three dogs.
DISPATCH: Okay. All right. And why are you doing miserably, what's going on?
MR. COHEN: Oh, my son's a thief, a liar, a cheat, a no-good person. He's mentally ill. He needs lots of help.
. . . .
DISPATCH: Uh-huh. Do you have any guns or knives with you right now?
. . . .
Mr. COHEN: No. I don't believe in guns or knives.
DISPATCH: Okay. All right. I do have a few deputies outside. Can you come out and talk to them real quick?
MR. COHEN: No, I don't want to.
DISPATCH: Okay. Why not?
MR. COHEN: Because I would like to die.
DISPATCH: So how would you do that if you would do it?
MR. COHEN: Oh, I have lots of drugs.
DISPATCH: Okay. One moment. Okay? One moment.

ORDER ON DEFENDANTS ANDRE ZALOZH
AND CRESA'S MOTION FOR SUMMARY
JUDGMENT- 3

MR. COHEN: Tell 'em not to come in. I've got three big dogs here. Not dangerous dogs, but three dogs who might get all excited if somebody came in. And I don't really care you know. My son probably called you, but, you know, he's the big problem. He's nothing worth any more life than me.
DISPATCH: Okay. Have you ever tried to commit suicide in the past?
MR. COHEN: I've tried.
DISPATCH: Okay.
MR. COHEN: I'm just drunk right now.
DISPATCH: How much have you had to drink?
MR. COHEN: A bottle of wine.
DISPATCH: Okay.
MR. COHEN: Tell 'em to -- to -- to go away.
DISPATCH: Okay. One moment.
MR. COHEN: You hear my dogs; they're not happy.
DISPATCH: Would they attack officers or anything?
MR. COHEN: No.
DISPATCH: No?
MR. COHEN: No. They're nice dogs. They'd jump up on 'em and they'd lick 'em.

Dkt. 43-2, at 11-13. Dispatcher Zalozh states that when Plaintiff first told him he had "three big dogs here," he immediately relayed to the deputies that Mr. Cohen was "threatening you that he's going to release his dogs." Dkt. 43-1, at 2. He "interpreted Mr. Cohen's comments about his dogs as a threat to the deputies." Dkt. 43-1, at 2. Dispatcher Zalozh states that after Plaintiff told him the dogs would not attack the officers, he reported to the deputies that Mr. Cohen was now "saying the dogs are not harmful and they will jump and lick you." Dkt. 43-1, at 2. Dispatcher Zalozh told the deputies that he could hear the dogs growling and "that they sounded aggressive" to him. Dkt. 43-1, at 2-3. The conversation between the Plaintiff and dispatcher Zalozh continued:

MR. COHEN: But tell 'em I don't want to go. I don't want to go to a psychiatric ward. I don't want anything like that. . . . It won't do any good, so there is no point.
. . . .
DISPATCH: Okay. Well, they just want to contact you and make sure that you are okay. It's not going to do great harm, you know, if you just open the door and just talk to them real - - -
MR. COHEN: No. They could arrest me and throw me in the psychiatric ward.

Dkt. 43-2, at 14. Sgt. Hayes states that at this point, she felt there was a mental health emergency. Dkt. 42-1, at 28. She knew Plaintiff was inebriated and felt "he could have ingested anything." Dkt. 42-1, at 28. Sgt. Hayes, in response to hearing that Plaintiff refused to come to the door, testified that she "used a ruse saying 'come to the door or we'll have to break down his door.'" Dkt. 42-1, at 43. Dispatcher Zalozh followed her directive and told Mr. Cohen the deputies will "'break down his front door' if they have to." Dkt. 43-1, at 3. The transcript of the recorded call states:

VOICE: (Inaudible) we will break down his front door.

ORDER ON DEFENDANTS ANDRE ZALOZH
AND CRESA'S MOTION FOR SUMMARY
JUDGMENT- 4

> MR. COHEN: And I don't want 'em to do that because I am not crazy.
> DISPATCH: Okay. Robert, they will contact you whether you like it or not, so we can do it, like, peacefully where you come out and talk to them or they will just break your door and they will talk to you. But either way, they have to talk to you in person. So it's going to be a lot more expensive for you if they would have to break down your door.
> MR. COHEN: All right. I'll go talk to them.
> DISPATCH: You'll go talk to them?
> MR. COHEN: Yes. . . I can barely walk.
> Dkt. 43-2, at 13-15.

Dkt. 52, at 2-6. Dispatcher Zalozh then says, "Okay. I'll stay with you on the phone and I'll tell 'em you're coming and they'll wait for you. Just take your time. Okay?" Dkt. 39-1, at 45. Mr. Cohen states, "All right. All right. All right. All right. Be quiet. Do not touch my dogs. (Inaudibles) They like people." Dkt. 39-1, at 45. Dispatcher Zalozh states that at that point, it sounded like Mr. Cohen was talking with deputies at his doorway, and so disconnected from the call. Dkt. 43-1, at 3. Plaintiff states that the recording sounds like it "suddenly cuts off." Dkt. 58.

Plaintiff, the non-moving party, alleges that the details of what happen next are in dispute. In any event, what is not in dispute is that the officers entered his home, a struggle ensued, one of Plaintiff's dogs was shot, and Plaintiff was taken into custody for a mental health evaluation. Dkt. 44. He was eventually released. *Id*.

On August 18, 2010, Plaintiff's investigator requested, on his behalf, all 9-1-1 tapes and radio audio tapes between the Clark County Sheriff's Office and CRESA relating to the May 30, 2010 incident. Dkt. 59-7, at 2-3. On September 9, 2010, the investigator inquired about the request. *Id*. CRESA allegedly responded that, "[i]ncoming calls we keep for 180 days and radio traffic for 90 days," and that "the system automatically deletes the recordings." *Id*. So, according to Plaintiff, CRESA's 90-day retention period had not expired when he originally made his request, but on or after August 23, 2010, CRESA destroyed the relevant radio calls. *Id*.

## B. PROCEDURAL HISTORY

On June 28, 2011, Plaintiff filed this case. Dkt. 1. In his Amended Complaint, he makes claims against the individual Defendants pursuant to 42 U.S.C. § 1983 for violation of his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution, including for "the warrantless entry into his home, the unreasonable seizure of his person and effects (companion dog), use of excessive force, and his arrest and detention without probable cause." Dkt. 28, at 13. He makes claims against the Clark County Sherriff's Office for violation of his rights against unreasonable searches and seizures under the Fourth and Fourteenth Amendments to the U.S. Constitution. *Id.* Plaintiff additionally makes claims for outrage, violations of Washington's Public Records Act, RCW 42.46 *et. seq.*, and for "destruction of evidence." Dkt. 28, at 13-14. Plaintiff seeks damages, injunctive relief, attorneys' fees, and costs. Dkt. 28, at 14-15.

Plaintiff's Motion for Partial Summary Judgment on his Fourth Amendment claims for the officers' warrantless entry into his home and his seizure for a mental health evaluation was denied because Plaintiff failed to show that there were no material issues in dispute and that he was entitled to a judgment as a matter of law. Dkt. 52.

Discovery is being conducted. Dkt. 61. Trial is set to begin on August 20, 2012. Dkt. 21.

## C. PENDING MOTION

In the pending motion, dispatcher Zalozh and CRESA move for summary dismissal of Plaintiffs' claims arguing that: 1) dispatcher Zalozh is entitled to qualified immunity as to Plaintiff's Fourth Amendment claims for entering his home without a warrant or legal cause, the unreasonable seizure of his person and effects (companion dog), use of excessive force, and arrest and detention without probable cause; 2) the claim for outrage asserted against both

dispatcher Zalozh and CRESA should be dismissed because dispatcher Zalozh's alleged conduct was not "extreme or outrageous;" and 3) Washington does not recognize a cause of action for damages for alleged destruction of evidence and so that claim should be dismissed. Dkts. 48 and 62.

Plaintiff does not oppose the motion regarding his claims against dispatcher Zalozh and CRESA for excessive force and outrage so long as the Defendant officers do not assert that dispatcher Zalozh's "fabricated threat" that Plaintiff would direct his dogs to attack them, "increased their perceived risk to officer safety." Dkt. 58, at 11-12. Accordingly, those claims should be dismissed.

Plaintiff opposes the motion regarding his remaining Fourth Amendment claims arguing that: 1) the Court has ruled that there are issued of fact that preclude summary judgment as to whether his consent to allow the officers into his home was valid, 2) dispatcher Zalozh participated in the entry and seizure of Plaintiff by communicating the threat on the phone, 3) dispatcher Zalozh caused the unconstitutional entry by providing incomplete information to the officers, 4) the Defendants do not claim that he was in immediate need of assistance, and Plaintiff's evidence shows that he was not, and so 5) dispatcher Zalozh is not entitled to qualified immunity on the remaining Fourth Amendment claims. Dkt. 58. Plaintiff argues that his claim for negligent destruction of 9-1-1 recordings should not be dismissed. *Id.*

**D. ORGANIZATION OF OPINION**

This opinion will first address the motion to summarily dismiss Plaintiff's Fourth Amendment claim, asserted against dispatcher Zalozh, and then will address the spoliation of evidence claim asserted against CRESA.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

**B. FOURTH AMENDMENT CLAIMS ASSERTED AGAINST DISPATCHER ZALOZH UNDER § 1983 AND QUALIFIED IMMUNITY**

In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the conduct complained of was committed by a person acting under color of state law, and that (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to remedy an alleged wrong only if both of these elements are present. *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

Defendants in a Section 1983 action are entitled to qualified immunity from damages for civil liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Harlow v. Fitzgerald*, 457 U.S. at 815. The existence of qualified immunity generally turns on the objective reasonableness of the actions, without regard to the knowledge or subjective intent of the particular official. *Id*. at 819. Whether a reasonable officer could have believed his or her conduct was proper is a question of law for the court and should be determined at the earliest possible point in the litigation. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872-73 (9th Cir. 1993).

In analyzing a qualified immunity defense, the Court determines: (1) whether a constitutional right would have been violated on the facts alleged, taken in the light most favorable to the party asserting the injury; and (2) whether the right was clearly established when viewed in the specific context of the case. *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. While the sequence set forth in *Saucier* is often appropriate, it should no longer be regarded as mandatory. *Pearson v. Callahan*, at 129 S.Ct at 811. "The judges . . . should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*.

Plaintiff's Motion for Partial Summary Judgment on his Fourth Amendment claims for warrantless entry and unreasonable seizure was denied because Plaintiff failed to show that there were no material issues in dispute and that he was entitled to a judgment as a matter of law. Dkt. 52. Although the Plaintiff argues that the Court has held that summary judgment is precluded on these issues, the holding was that Plaintiff had not carried his burden and so could not be granted judgment summarily on his claim. *Id.* In an effort to fully consider the other Defendants' positions on these issues, for the purposes of this motion, the second prong in the *Saucier* analysis is useful in examining whether Plaintiff's Fourth Amendment claims for the warrantless entry into his home and detention for a mental health evaluation, asserted against dispatcher Zalozh, should be dismissed.

> 1. *Relay of Threat and the Officers' Subsequent Entry into the Home – Clearly Established Violation by Dispatcher Zalozh?*

The Fourth Amendment to the U.S. Constitution guarantees, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." "A warrantless entry into a home violates the Fourth Amendment unless an exception to the Fourth Amendment warrant requirement applies, such as emergency, exigency, or consent." *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 533 (9th Cir. 2010). The Fourth Amendment, however, "has drawn a firm line at the entrance to the house." *Payton v. New York*, 445 U.S. 573, 590 (1980).

Dispatcher Zalozh's motion to summarily dismiss Plaintiff's Fourth Amendment claims against him for the officers' entry into the house should be granted. Plaintiff cites no authority establishing that it would be clear to a reasonable dispatcher that his conduct was unlawful in the situation with which Zalozh was confronted. *Saucier,* at 2156. Viewing the evidence in a light most favorable to Plaintiff, Plaintiff's son called 9-1-1 and reported to dispatcher Zalozh that Plaintiff was threatening to do himself harm that night, and had attempted to do so in the past by taking pills. Dkt. 43-2, at 2-7. Dispatcher Zalozh sent officers to respond. Dkt. 43-1. He was in radio contact with the officers and, at the officers' request, contacted Plaintiff by phone. Dkt. 43-1. After Plaintiff told dispatcher Zalozh that he was "miserable," dispatcher Zalozh told Plaintiff he had a few deputies outside and asked if Plaintiff would come out and talk with them. Dkt. 43-2, at 11-13. Plaintiff said "no," and when asked "why?" Plaintiff stated "[b]ecause I would like to die." *Id*. Dispatcher Zalozh then asked, "[s]o how would you do that if you would do it?" Plaintiff responded, "[o]h, I have lots of drugs." *Id*. Plaintiff further acknowledged to Dispatcher Zalozh that he had tried to commit suicide in the past by taking pills and that he had consumed a bottle of wine that night. *Id*. At this point, Defendant Sgt. Linda Hayes states that

she felt there was a mental health emergency.  Dkt. 42-1, at 28.  She knew Plaintiff was inebriated and felt "he could have ingested anything."  Dkt. 42-1, at 28.  Sgt. Hayes, in response to hearing that Plaintiff refused to come to the door, testified that she "used a ruse saying 'come to the door or we'll have to break down his door.'"  Dkt. 42-1, at 43.  Dispatcher Zalozh followed her directive and told Mr. Cohen the deputies will "'break down his front door' if they have to."  Dkt. 43-1, at 3.  Plaintiff agreed to open the door, and when dispatcher Zalozh heard him talking with the officers at the door, he disconnected the call.  Dkt. 43-1.  It is undisputed that dispatcher Zalozh did not enter the house that night.  He passed on the officers' stated intention to force the door open.  Even if the threat to break down the door was a hollow one, there is no evidence that dispatcher Zalozh knew that.  Plaintiff maintains that it was dispatcher Zalozh's role in the "ruse" that caused the later violations of his rights.  Dkt. 58.  Plaintiff, however, fails to acknowledge that "[i]n some circumstances, officers can obtain an invitation to enter a private place through a ruse in order to investigate criminal activity."  *U.S. v. Garcia*, 997 F.2d 1273, 1280 (9th Cir. 1993)(*citing Lewis v. United States*, 385 U.S. 206, 211(1966)).  For example, "[a]n officer may, consistent with the fourth amendment, conceal his or her identity to obtain an invitation to enter a suspect's home."  *U.S. v. Bosse,* 898 F.2d 113, 115 (9th Cir. 1990); *but see United States v. Johnson*, 626 F.2d 753 (9th Cir.1980).  The officer may not, however, acquire entry by "misrepresenting the scope, nature or purpose of a government investigation."  *Bosse*, at 115.  There is no evidence that the dispatcher Zalozh or the officers misrepresented "the scope, nature or purpose" of their visit to Plaintiff's home that night.

Further, there is no evidence that dispatcher Zalozh knew that the officers were going to enter the home.  The officers' relayed that they wanted to talk with Plaintiff to check on his mental health, something that could have been accomplished on the porch.  Even assuming that

he knew that the officers were going to enter the house, Dispatcher Zalozh argues that he is entitled to qualified immunity because it was objectively reasonable for him to believe that an emergency aid situation was presented. Dkts. 48 and 62.

"Under the emergency exception, an officer may enter a home without a warrant to investigate an emergency that threatens life or limb if the officer has objectively reasonable grounds to believe that an emergency exists and that his immediate response is needed." *Espinosa,* at 534 (*internal citations omitted*). Derived from police officers' community caretaking function, this exception allows the police to enter a home when an emergency which threatens physical harm is presented. *Id.* The officer must have an objectively reasonable belief that the circumstances justify entry. *Id*.

Even assuming that as a dispatcher he was an "active participant" in the officers' warrantless entry, Dispatcher Zalozh's motion for summary dismissal of Plaintiff's Fourth Amendment claim against him for the entry into his home that night should be granted. Plaintiff has failed to point to any authority which would give dispatcher Zalozh "fair warning" that his role in the officers' entry into the home violated Plaintiff's clearly established rights considering the events of the evening. *Torres v. City of Madera,* 648 F.3d 1119, 1129 (9th Cir. 2011). As above, dispatcher Zalozh was unaware what, if any, pills, in addition to a bottle of wine, Plaintiff had consumed. If he had taken pills, dispatcher Zalozh did not know how long they would take to effect Plaintiff or what kind of symptoms he would have. Dispatcher Zalozh was not present at the scene to observe Plaintiff's demeanor. To the extent that he was connected with the officers' decision to enter the home, a reasonable dispatcher in his place would have had "an objectively reasonable belief that the circumstances justify entry." *Espinosa,* at 534.

This holding does not conflict with the April 16, 2012, Order on Plaintiff's Partial Motion for Summary Judgment. Dkt. 52. The prior order held that Plaintiff failed to carry his burden to show that "there are no issues of fact as to whether there was an emergency situation" and that he was entitled to a judgment as a matter of law. Dkt. 52, at 17-19. In so far as the entry into the home is concerned, Plaintiff's Fourth Amendment claim against dispatcher Zalozh should be dismissed because he has qualified immunity.

2. *Seizure of Plaintiff – Clearly Established Violation by Dispatcher Zalozh?*

Dispatcher Zalozh's motion to summarily dismiss Plaintiff's Fourth Amendment claim for his seizure and detention for a mental health evaluation should be granted. As stated in the April 16, 2012, Order,

> Under Washington law, a police officer has, 'the authority to take a person to a hospital for mental evaluation upon 'reasonable cause to believe that such person is suffering from a mental disorder and presents an imminent likelihood of serious harm or is in imminent danger because of being gravely disabled.'" *Luchtel v. Hagemann,* 623 F.3d 975, 979 (9th Cir. 2010)(*quoting* RCW 71.05.150(4)).
> In *Luchtel,* the Ninth Circuit found that police officers had reasonable cause to take a woman to the hospital for a mental health evaluation, and affirmed the district court's dismissal of her Fourth Amendment claim. *Id.* In that case, calls to 9-1-1 reported that she was hiding under a car with her son, outside screaming that someone was going to kill her, and that she was going to kill herself. *Id.* When the officers arrived, they learned that she was on drugs and was hiding at a neighbor's house. *Id.* Once they made contact with her, she made paranoid comments and attempted to use the neighbor as a human shield. *Id.*

Dkt. 52. While not as extreme as the woman in *Luchtel*, even when viewed in a light most favorable to Plaintiff, Dispatcher Zalozh had "reasonable cause to believe" that Plaintiff was suffering from a "mental disorder" and presented "an imminent likelihood of serious harm" or was in "imminent danger because of being gravely disabled" (*Luchtel,* at 979) considering the situation. This is particularly true as to dispatcher Zalozh because he was not present on the scene. (In Response to the Plaintiff's motion for partial summary judgment, the Defendant

officers argued that, in part, Plaintiff's demeanor once they were in the house made them think that he needed to be assessed by medical health professionals.) The above analysis regarding whether the situation was an emergency applies. Considering all the circumstances, the Fourth Amendment claim against dispatcher Zalozh, regarding the seizure of Plaintiff for a mental health evaluation, should be dismissed because dispatcher Zalozh is entitled to qualified immunity.

 3. *Conclusion*

Plaintiff's Fourth Amendment claims against dispatcher Zalozh should be dismissed. Plaintiff has agreed to dismissal of the excessive force claim as against dispatcher Zalozh. Dispatcher Zalozh is entitled to qualified immunity for his passing on the officers' stated intention to break down the door, for dispatcher Zalozh's role in the officers' decision to enter Plaintiff's home that night, and for dispatcher Zalozh's role in the officers' decision to detain Plaintiff for a mental health evaluation. Dispatcher Zalozh's motion should be granted.

**C. STATE CLAIM FOR DAMAGES FOR THE DESTRUCTION OF 9-1-1 RECORDINGS ASSERTED AGAINST CRESA**

"Spoliation is defined as the intentional destruction of evidence." *Ripley v. Lanzer*, 152 Wn. App. 296 (2009).

Defendant CRESA's motion to dismiss Plaintiff's claim for the spoliation of evidence should be granted. CRESA does not dispute that it deleted the requested records. Plaintiff, however, has failed to point to any authority which supports his theory that this deletion of records is a recognized claim in Washington state for damages. In Washington,

> [W]here relevant evidence which would properly be a part of a case is within the control of a party whose interests it would naturally be to produce it and he fails to do so, without satisfactory explanation, the only inference which the finder of fact may draw is that such evidence would be unfavorable to him.

ORDER ON DEFENDANTS ANDRE ZALOZH
AND CRESA'S MOTION FOR SUMMARY
JUDGMENT- 15

*Pier 67, Inc. v. King County*, 89 Wash.2d 379, 385-86 (1977). To remedy spoliation the court may apply that rebuttable presumption. *See Marshall v. Bally's Pacwest, Inc.*, 94 Wn.App. 372, (1999). There is no claim remaining against CRESA or any of its employees to apply such a presumption. Moreover, Plaintiff offers no evidence of bad faith. The claim against CRESA for spoliation of evidence should be dismissed.

### III. ORDER

Therefore, it is hereby **ORDERED** that:

- Defendants Andrey Zalozh and Clark Regional Emergency Services Agency's Motion for Summary Judgment (Dkt. 48) is **GRANTED**;
- Plaintiff's claims against those defendants are **DISMISSED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 18th day of May, 2012.

*/s/ Robert J. Bryan*

ROBERT J. BRYAN
United States District Judge